## No. 11-10511

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

—————————————————

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**v.**

**TYMOND J. PRESTON,**

**Defendant-Appellant.**

—————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA (3:10-CR-08026-GMS)

—————————————————

**DEFENDANT-APPELLANT'S OPENING BRIEF**

—————————————————

Keith Swisher, 023493
PHOENIX SCHOOL OF LAW*
One North Central Avenue
Phoenix, Arizona 85004-4418
Phone: 602.432.8464
Email: kswisher@phoenixlaw.edu

—————————————

\*    Institutional designation is for identification purposes only.

# TABLE OF CONTENTS

STATEMENT OF BAIL STATUS ...................................................................1

STATEMENT OF JURISDICTION ..............................................................1

STATEMENT OF THE ISSUES ...................................................................2

STATEMENT OF THE CASE ......................................................................2

     A.    Nature of the Case, Course of Proceedings, and Disposition Below.....2

     B.    Statement of Facts ...............................................................3

SUMMARY OF ARGUMENT .....................................................................10

STANDARDS OF REVIEW .......................................................................11

ARGUMENT ..........................................................................................13

I.     MR. PRESTON'S CONFESSION WAS INVOLUNTARY. .........................13

II.    MR. PRESTON'S WAIVERS OF HIS RIGHTS TO A JURY TRIAL, INDICTMENT, AND CONFRONTATION WERE INVOLUNTARY.......................................29

III.   THE EVIDENCE WAS CONSTITUTIONALLY INSUFFICIENT AND MISLEADING. ...34

IV.   THE DISTRICT COURT ADMITTED HEARSAY IN VIOLATION OF THE RULES OF EVIDENCE AND THE CONFRONTATION CLAUSE. ...............................................45

V.    MR. PRESTON'S SENTENCE OF LIFETIME SUPERVISED RELEASE WAS BOTH PROCEDURALLY AND SUBSTANTIVELY UNREASONABLE, AND THREE OF HIS SUPERVISED RELEASE CONDITIONS WERE ALSO UNREASONABLE. ................47

CONCLUSION .......................................................................................53

CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)(7)(B) ...........................54

STATEMENT REGARDING RELATED CASES ..............................................55

CERTIFICATE OF FILING AND SERVICE ....................................................56

## TABLE OF AUTHORITIES

**CASES**                                                                                              **PAGE**

*Atkins v. Virginia*, 536 U.S. 304, 309 n.5 (2002)                                                          27
*Beckwith v. United States*, 425 U.S. 341, 348 (1976)                                                       16
*Boykin v. Alabama*, 395 U.S. 238, 243–44 (1969)                                                            37
*Bram v. United States*, 168 U.S. 532, 542–43 (1897)                                                        16
*Colorado v. Connelly,* 479 U.S. 157, 165 (1986)                                                            26
*Columbe v. Connecticut*, 367 U.S. 568, 620 (1973)                                                          28
*Crawford v. Washington,* 541 U.S. 36 (2004)                                                                53
*Fikes v. Alabama,* 352 U.S. 191, 196–98 (1957)                                                             26
*Gall v. United States,* 552 U.S. 38, 51 (2007)                                                             15
*Godinez v. Moran,* 509 U.S. 389, 401 n.12 (1993)                                                           33
*Haynes v. Washington,* 373 U.S. 503, 513–14 (1963)                                                         16
*Henry v. Dees,*  658 F.2d 406, 411 (5th Cir. 1981)                                                         28
*Hummel v. Rosemeyer*, 564 F.3d 290, 298 (3d Cir. 2009)                                                     28
*Jackson v. Denno*, 378 U.S. 368, 376 (1964)                                                                16
*Jackson v. Virginia*, 443 U.S. 307, 319 (1979)                                                             40
*Malloy v. Hogan*, 378 U.S. 1, 8 (1964)                                                                     16
*Morris v. Maryland*, 13 A.3d 1206  (Md. 2011)                                                              35
*People v. Collins,* 438 P.2d 33 (Cal. 1968)                                                                44
*Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)                                                       17
*Spano v. New York,* 360 U.S. 315, 321–22 (1959)                                                            26
*States v. Villalobos*, 333 F.3d 1070, 1073 (9th Cir. 2003)                                                 13
*Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993)                                                           40
*United States v. Aleman*, 417 F. Supp. 117, 120 (S.D. Tex. 1976)                                           38
*United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1056–57 (9th Cir. 2009)                                  56
*United States v. Arellano-Gallegos,* 387 F.3d 794, 797 (9th Cir. 2004)                                     38
*United States v. Azubike*, 504 F.3d 30, 38–42 (1st Cir. 2007)                                              51
*United States v. Bailon-Santana*, 429 F.3d 1258, 1260–61 (9th Cir. 2005)                                   34
*United States v. Carty*, 520 F.3d 984, 992 (9th Cir. 2008) (en banc)                                   55, 56
*United States v. Chischilly*, 30 F.3d 1144, 1156 (9th Cir. 1994)                                       44, 46
*United States v. Christensen*, 18 F.3d 822, 826 (9th Cir. 1994)                                        13, 33
*United States v. Coleman*, 208 F.3d 786, 791 (9th Cir. 2000)                                               36
*United States* v. *Combs,* 379 F.3d 564 (9th Cir. 2004)                                                    49
*United States v. Cope*, 527 F.3d 944, 951–52 (9th Cir. 2008)                                         57, 58, 59
*United States v. Dominguez Benitez,* 542 U.S. 79, 84 n.10 (2004)                                           38
*United States v. Duarte-Higareda*, 113 F.3d 1000, 1002 (9th Cir. 1997)                                 12, 34

*United States v. Freeman*, 498 F.3d 893, 900–01 (9th Cir. 2007)   14

*United States v. Gonzalez-Flores*, 418 F.3d 1093, 1098 (9th Cir. 2005)   14

*United States v. Green*, 556 F.3d 151 (3d Cir. 2009)   53

*United States v. Guagliardo*, 278 F.3d 868, 872 (9th Cir. 2002)   57, 60

*United States v. Hall*, 974 F. Supp. 1198, 1204 (C.D. Ill. 1997)   22

*United States v. Harrison*, 34 F.3d 886, 890 (9th Cir. 1994)   12, 24, 31, 32

*United States v. Jacobo Castillo,* 496 F.3d 947, 957 (9th Cir. 2007)   2

*United States v. Jenkins*, 504 F.3d 694, 700 (9th Cir. (2008)   36

*United States v. Lopez,* 437 F.3d 1059, 1065 (10th Cir. 2006)   31

*United States v. Monzon*, 429 F.3d 1268, 1271 (9th Cir. 2005)   13

*United States v. Murdock*, 398 F.3d 491, 496 (6th Cir. 2005)   38

*United States v. Orduno-Aguilera*, 183 F.3d 1138, 1139–40 (9th Cir. 1999)   12

*United States v. Portillo-Cano*, 192 F.3d 1246, 1250 (9th Cir.1999)   13

*United States v. Reddest*, 512 F.3d 1067, 1073 (8th Cir. 2008)   42

*United States v. Rios*, 449 F.3d 1009, 1011 (9th Cir. 2006)   12

*United States v. Rodrigues*, 159 F.3d 439 (9th Cir. 1999)   50, 51

*United States v. Rudberg,* 122 F.3d 1199, 1206 (9th Cir. 1997)   13

*United States v. Sioux*, 362 F.3d 1241, 1244 n.5 (9th Cir. 2004)   14

*United States v. Stephens*, 482 F.3d 669, 672 (4th Cir. 2007)   41

*United States v. Tingle*, 658 F.2d 1332, 1334 (9th Cir. 1981)   15, 31

*United States v. Weatherspoon,* 410 F.3d 1142 (9th Cir. 2005)   48

*United States v. Wise*, 391 F.3d 1027, 1031 (9th Cir. 2004)   15

*Wilson v. Lawrence County*, 260 F.3d 946, 953 (8th Cir. 2001)   25, 26

*Winzer v. Hall*, 494 F.3d 1192, 1196 (9th Cir. 2007)   15, 53, 54

*Withrow v. Williams*, 507 U.S. 680, 693–94 (1993)   29

## <u>STATUTES AND RULES</u>                                              <u>PAGE</u>

18 U.S.C. § 3231 ..........................................................................................2
18 U.S.C. § 3553(a).....................................................................................50
18 U.S.C. § 3583 ........................................................................................50
FED. R. EVID. 401 ........................................................................................38
FED. R. EVID. 702 ........................................................................................39
FED. R. EVID. 803(2) ...................................................................................47
FED. R. CRIM. P. 11......................................................................................33

## <u>OTHER</u>                                                            <u>PAGE</u>

Bill Donovan, *Census: Navajo Enrollment Tops 300,000*, NAVAJO TIMES,
   July 7, 2011.................................................................................42

Brandon L. Garrett, *The Substance of False Confessions*, 62 STAN. L. REV. 1051
   (2010).........................................................................................24

FRED E. INBAU ET AL., CRIMINAL INTERROGATIONS AND CONFESSIONS (5th ed.
   2011) ...............................................................................22, 36

John B. Gould & Richard A. Leo, *One Hundred Years Later: Wrongful Convictions
   After a Century of Research*, 100 J. CRIM. L. & CRIMINOLOGY 825 (2010) ...18, 22

Richard A. Leo & Richard J. Ofshe, *The Consequences of False Confessions:
   Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological
   Interrogation,* 88 J. CRIM. L. & CRIMINOLOGY 429 (1988)...................................18

Saul M. Kassin et al., *Police-Induced Confessions: Risk Factors and
   Recommendations*, 34 LAW & HUM. BEHAV. 3 (2010)...................................21, 24

No. 11-10511

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

———————————————

STATEMENT OF BAIL STATUS

Defendant-Appellant Tymond J. Preston is currently in the custody of the Bureau of Prisons, serving the sentence imposed in the judgment from which this appeal is taken. His projected release date is December 7, 2013.

STATEMENT OF JURISDICTION

The United States District Court for the District of Arizona (Snow, D.J.) had jurisdiction over the federal criminal charges against Mr. Preston pursuant to 18 U.S.C. § 3231. The district court entered its final judgment on September 27, 2011. [ER 3; CR 143.][1] Mr. Preston timely filed his notice of appeal seven days later. [FRAP 4(b)(1); ER 1.] This Court has jurisdiction over Mr. Preston's appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

———————————————

[1]. The abbreviation "CR" refers to the Clerk's Record and will be followed by the applicable document number(s). The abbreviation "RT" will refer to the Reporter's Transcript and will be followed by the applicable date and page number(s). The abbreviation "ER" refers to the Excerpts of Record and will be followed by the applicable page number(s). The abbreviation "Sealed ER" refers to the Sealed Excerpts of Records. Finally, a statutory Addendum is attached to this Brief, pursuant to Ninth Circuit Rule 28-2.7.

## STATEMENT OF THE ISSUES

I. *Whether the district court should have suppressed Mr. Preston's confession in light of Mr. Preston's age and mentally impaired condition and the agents' repeated and diverse use of psychologically coercive tactics.*

II. *Whether the district court should have accepted Mr. Preston's waiver of his rights to a jury trial, indictment, and confrontation when Mr. Preston could not fully understand what he was waiving and when the government would seek many more years of prison time if Mr. Preston did not waive his rights.*

III. *Whether the evidence was constitutionally insufficient, irrelevant, or misleading.*

IV. *Whether the district court erred by admitting hearsay evidence on the basis of an "excited utterance" when that utterance occurred hours after the excitement-causing event.*

V. *Whether the district court erred by failing to give notice and sufficient reasons for its imposition of lifetime supervised release and three vague conditions of that release.*

## STATEMENT OF THE CASE

A. *Nature of the Case, Course of Proceedings, and Disposition Below*

On February 16, 2010, a federal grand jury returned an indictment charging Mr. Preston with one count of aggravated sexual abuse of a minor, in violation of 18 U.S.C. §§ 1153, 2241(c), 2246(2)(A). [ER 7; CR 1.] A year later, the government agreed to dismiss the indictment and file an information charging one count of abusive sexual contact, in violation of 18 U.S.C. §§ 1153, 2244. [ER 9; CR 101.]

2

From May 24 to May 26, 2011, Mr. Preston received a three-day bench trial. On June 2, 2011, the district court found Mr. Preston guilty of abusive sexual contact. [ER 185; CR 131.] The United States Probation Office subsequently drafted a presentence report.[2] Both sides then filed sentencing memoranda. [ER 197, 204; CR 138, 141.]

On September 26, 2011, the district court sentenced Mr. Preston as follows: "**IT IS THE JUDGMENT OF THIS COURT THAT** the defendant is hereby committed to the custody of the Bureau of Prisons for a term of **FIFTY (50) MONTHS** on Count 1, with credit for time served. Upon release from imprisonment, the defendant shall be placed on supervised release for a term of **LIFE** on Count 1." [ER 3; CR 143.]

### B.    Statement of Facts

September 23, 2009 was a Wednesday. Mr. Preston was eighteen years old. [ER 94.] That afternoon or early evening, Mr. Preston's relative and neighbor, John Doe, entered and exited Mr. Preston's house.[3] Later that night, when John Doe's grandparents asked Doe why he was upset, he apparently responded that Mr. Preston

---

2.    Pursuant to Ninth Circuit Rule 30-1.10, Mr. Preston filed four copies of the presentence report under seal when he filed this Brief. References to the presentence report will be to "PSR" followed by the relevant paragraph number.

3.    The alleged victim was a minor (eight) on September 23, 2009 and consequently his real name will not be used; instead, he will be referred to simply as John Doe.

"put his penis in [my] butt."[4]  [Sealed ER 128.]  When asked about this statement in a forensic interview the following day, John Doe offered "what appears to be an imagined narrative involving sexual assaults on the victim's sister, Defendant's confrontation with the victim in the victim's bedroom, Defendant's escape from the victim's bedroom, knife threats, Defendant's pursuit of the victim to the victim's grandmother's house seven miles away, helicopters, searchlights and 911 calls."[5]  [ER 190 (noting that many details in John Doe's statement "are obviously not factual").]  Interestingly, John Doe's first words were relatively advanced for an eight year old— that Mr. Preston "put his penis in my butt."[6]  [Sealed ER 238.]  When pressed for

---

4.     As a background to the credibility of any accusation, the relatives living at John Doe's house are biased against Mr. Preston, his mother, and his father because of a long-standing interfamily feud.  [*See, e.g.*, Sealed ER 130–31, 479–80.]

5.     Moreover, "when the victim described the details concerning the actual assault, the victim described events that are unsupported by the subsequent forensic examination of the victim and his clothing. For example, the victim indicated that during the course of the assault Defendant ejaculated in his mouth, on his lips, on his red shirt, and on his stomach. The forensic examination of the victim and the clothing he was wearing nevertheless revealed neither evidence of any semen nor the existence of any red shirt. For that matter the physical examination of the victim showed  no signs of trauma or semen."  [ER 190–91 (Findings of Fact).]

6.     John Doe's original language may have been that "Tymond put his dick in my butt," but it had been refined, somehow, to "penis" by the time he reached the forensic examination.  [Sealed ER 410.]  John Doe's sexual vocabulary and imagery may have been acquired through pornographic films.  [Sealed ER 411, 619–20 (noting that both John Doe and his minor companion that evening knew "a lot about sex" and were accused of grabbing one another inappropriately); ER 192–93 ("The Court agrees

truthful details, however, John Doe was unable to provide them, and the nurse acknowledged having trouble understanding his other responses.  [Sealed ER 238.]

John Doe did add that Mr. Preston "put on a 'dick wearing,' then he 'spits on his dick' and 'he puts it in my butt.'"  [ER 192.]  The forensic nurse, however, was the first person to suggest to John Doe that a condom ("dick wearing") might have been used.  [Sealed ER 184–85; Sealed ER 261–62 (confirming that two different examiners suggested the presence of a condom to John Doe).][7]  She was also the first one to suggest that Mr. Preston used lubrication.  [Sealed ER 189.][8] The agents never looked for the condom or its wrapper, which Mr. Preston reportedly discarded in his home trashcan.  [Sealed ER 469.]  Similarly, although John Doe also said that Mr. Preston had ejaculated on Doe's red shirt, the agents never looked for the shirt.  [Sealed ER 458–59.]

---

that there is sufficient evidence in the record to conclude that the victim had been exposed to pornographic movies at the home of Defendant or otherwise.").]

7.    Agents also initially and repeatedly suggested condom use to Mr. Preston. [Sealed ER 442–43.]

8.    In light of these suggested items, the government's closing argument surprisingly praised John Doe for his detail: "And this is such a descriptive characterization for an eight-year-old child.  This is him describing a poor man's lubricant.  And how does this kid know about condoms or a poor man's lubricant unless something has happened to him? . . .  This is knowledge above and beyond that of an eight-year-old child."  [Sealed ER 570.]

Although John Doe was medically examined in detail, John Doe had no signs of injury (e.g., no bruising, scraping, bleeding). [*E.g.*, Sealed ER 171–72; *see also id.* 176 (noting a "normal genital and anal exam"), 187–89 (noting reluctantly the absence of abrasions or tearing).] John Doe likewise tested negative for STDs. [Sealed ER 177.] He did not "seem sad" after the alleged incident. [Sealed ER 649.] And although John Doe complained about pain in his buttocks, that pain would have been consistent with a kick, for example.[9] [Sealed ER 175.] Finally, John Doe said that Mr. Preston dragged or slid Doe into Mr. Preston's house by his head or neck, but no evidence of head or neck injuries—in even the slightest degree—were found. [*See* Sealed ER 186, 253–54.]

In light of John Doe's story, however, agents began an investigation. On October 1, 2009, two agents went to Mr. Preston's home to question him. They accused him of molesting John Doe last "Friday" evening.[10] Although they also mentioned the "23rd" early in the recording, they later dropped the "23rd" during the bulk of the recording and commanded—sixteen times—that Mr. Preston tell them what happened with John Doe on "Friday." September 23, 2009 was a Wednesday, and Mr.

---

9.    Mr. Preston acknowledged kicking John Doe from behind, because Doe broke Mr. Preston's Xbox video game player that day. [Sealed ER 494–95, 528, 552.]

10.    Shortly after the agents began questioning Mr. Preston, they audiotaped the conversation. Mr. Preston has provided four copies of that audio recording to this Court under seal.

Preston had not been at his house on Friday.  Later, the agents switched the date and day of the crime to "September 24" and "Thursday."  After denying repeatedly any untoward behavior (even being present) for thirty minutes into the interrogation, Mr. Preston eventually agreed with the agents' leading questions (although Mr. Preston's initial agreement is alarmingly inaudible).  At the end of the interrogation, the agents wrote out a statement containing the information that they had fed to Mr. Preston and "had" him sign it.  It reads in full:

> *10/30/09 [sic[11]]*
>
> *Tymond Preston was in his residence in living room ~~at appr. 6:30 p.m.~~ on the even[in]g of 9/23/09.  [Minor companion] and [John Doe] were outside his residence.  [John] walked in the house.  [John] pulled down his pants.  Tymond unzipped zippe[r], pulled penis out of pants, put a condom on.  Then ~~yo~~ Tymond inserted Penis into [John's] butt for 5 or 6 seconds.  Tymond pulled away.  [John] pulled up pants, walked outside and started crying.*
>
> *Tymond is sorry it happened.*
>
> *s/SA James Kraus*
> *s/Tymond Preston*
> *s/Greg Jon Secatero*

[ER 15.]

---

11.  Although the interview could not have occurred on October 30, 2009, Mr. Preston nevertheless signed the agents' statement, which they falsely claimed was an apology to John Doe.  Indeed, Mr. Preston did not add or change anything on the statement.

Finally, the government performed DNA analysis from samples of the DNA of John Doe, Mr. Preston, and several family members living in Doe's house. All of the DNA samples from Mr. Doe were negative for sperm or semen. [Sealed ER 332.] These included swabs of Doe's lips, anus, genitals, body, and clothing. In addition to being negative for sperm or semen, none of these swabs contained DNA evidence from other sources (e.g., touching or salivating) that matched Mr. Preston. Mr. Doe's underwear was also swabbed for DNA in several places. That swab contained DNA from at least three contributors and possibly more (from a source other than sperm or semen). [Sealed ER 297–300, 330.] The mixture likely contained both male and female DNA. [Sealed ER 296.] According to the government's DNA analyst, however, Mr. Preston's DNA profile could not be excluded from the mixture; in other words, although the mixture involves multiple people, a profile consistent with Mr. Preston's DNA profile can be cobbled together. Both Carolyn Begay and Doe's companion—both of whom reported Mr. Preston—could also not be excluded from the underwear. [Sealed ER 302.] The DNA analyst acknowledged, moreover, that population statistics—which were used to estimate the frequency of a particular DNA profile—were overstated if a relative was involved. [Sealed ER 306.] Moreover, the DNA found on underwear could have come from the *outer* waistband lining. [Sealed ER 331.] Because the mixture contained a third (or fourth or fifth) unidentified

contributor, it is impossible to know who contributed the various alleles located at various loci. [Sealed ER 362–63.]

In light of Mr. Preston's confession and Doe's statement, however, a federal grand jury returned an indictment in 2010 charging Mr. Preston with one count of aggravated sexual abuse of a minor, in violation of 18 U.S.C. §§ 1153, 2241(c), 2246(2)(A). [ER 7; CR 1.] A year later, the government agreed to dismiss the indictment and file an information charging one count of abusive sexual contact, in violation of 18 U.S.C. §§ 1153, 2244. [ER 9; CR 101.]

From May 24 to May 26, 2011, Mr. Preston received a three-day bench trial on the count in the information. On June 2, 2011, the district court found Mr. Preston guilty of abusive sexual contact. [ER 185; CR 131.] The United States Probation Office subsequently drafted a presentence report.[12] Both sides then filed sentencing memoranda. [ER 197, 204; CR 138, 141.]

On September 26, 2011, the district court sentenced Mr. Preston as follows: "**IT IS THE JUDGMENT OF THIS COURT THAT** the defendant is hereby committed to the custody of the Bureau of Prisons for a term of **FIFTY (50) MONTHS** on Count 1, with credit for time served. Upon release from imprisonment, the defendant shall be placed on supervised release for a term of **LIFE** on Count 1." [ER 3; CR 143.] Among

---

12.    Pursuant to Ninth Circuit Rule 30-1.10, Mr. Preston filed four copies of the presentence report under seal when he filed this Brief.

the many other specific supervised released conditions, the district court added three particularly concerning conditions: (1) "You shall attend and participate in plethysmograph testing as directed by your probation Officer;" (2) "You shall not possess, view, or otherwise use any other material that is sexually stimulating, sexually oriented, or deemed to be inappropriate by the probation officer and/or treatment provider. You will submit any records requested by the probation officer to verify your compliance with this condition. You shall not enter any location where the primary function is to provide these prohibited materials;" and (3) "You shall not be in the company of or have contact with children under the age of 18 without prior approval of the probation officer." [ER 5–6.]

Mr. Preston appeals. [ER 1.]

## SUMMARY OF ARGUMENT

This case presents an intolerably high risk that an eighteen-year-old, mentally impaired defendant was convicted of a crime he did not actually commit. In essence, there were three pieces of evidence: (1) Mr. Preston's confession; (2) the alleged minor victim's statement; and (3) DNA evidence. In short, however, the confession was involuntary, the victim's statement was fantastical, and most of the DNA evidence excluded Mr. Preston, while the rest of it was inconclusive and misleadingly used.

Particularly, the district court erred in the following ways: (I) Mr. Preston's confession and accompanying signed statement were involuntarily extracted, in

violation of due process and the Fifth Amendment, and consequently should have been suppressed; (II) Mr. Preston's waiver of his rights to a jury trial, indictment, and confrontation were also involuntary; (III) the evidence was both insufficient and misleadingly misconstrued; (IV) the district court improperly admitted hearsay statements in violation of the Federal Rules of Evidence and the Confrontation Clause; and (V) the imposition of a lifetime term of supervised release was both procedurally and substantively unreasonable, and three of Mr. Preston's supervised release conditions were unreasonable, vague, and overbroad.

## STANDARDS OF REVIEW

This Court reviews "de novo whether a statement was voluntary." *United States v. Harrison*, 34 F.3d 886, 890 (9th Cir. 1994).

The Court generally reviews de novo whether the evidence was constitutionally sufficient. *United States v. Rios*, 449 F.3d 1009, 1011 (9th Cir. 2006); *United States v. Orduno-Aguilera*, 183 F.3d 1138, 1139–40 (9th Cir. 1999).

The Court reviews de novo the adequacy of a jury trial waiver. *United States v. Duarte-Higareda*, 113 F.3d 1000, 1002 (9th Cir. 1997). "The suspected presence of mental or emotional instability eliminates any presumption that a written waiver is voluntary, knowing or intelligent." *United States v. Christensen*, 18 F.3d 822, 826 (9th Cir. 1994). Similarly, the Court reviews *de novo* the adequacy of a Rule 11 plea

colloquy. *United States v. Villalobos*, 333 F.3d 1070, 1073 (9th Cir. 2003). In assessing the adequacy of a Rule 11 colloquy, the Court considers only the record of the plea proceedings, *United States v. Portillo-Cano*, 192 F.3d 1246, 1250 (9th Cir. 1999); in assessing the effect of the Rule 11 error, the Court looks to the entire record, not to the plea proceedings alone, and reverses whenever the error affects substantial rights. *United States v. Monzon*, 429 F.3d 1268, 1271 (9th Cir. 2005).

The Court reviews whether "a prosecutor vouched for the credibility of witnesses for plain error when there has been no objection by the defendant." *United States v. Rudberg,* 122 F.3d 1199, 1206 (9th Cir. 1997). "Plain error is highly prejudicial error affecting substantial rights," affecting the "fairness, integrity or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted).

The Court reviews for an abuse of discretion the district court's decision to admit expert testimony. *United States v. Freeman*, 498 F.3d 893, 900–01 (9th Cir. 2007). Similarly, the district court's "determination that the prejudicial effect of particular evidence did not substantially outweigh its probative value under Federal Rule of Evidence 403 is reviewed for an abuse of discretion." *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1098 (9th Cir. 2005). The district court's construction or interpretation of the Federal Rules of Evidence, however, is generally subject to de novo review. *See United States v. Sioux*, 362 F.3d 1241, 1244 n.5 (9th Cir. 2004).

"Alleged Confrontation Clause violations are also reviewed de novo." *Winzer v. Hall*, 494 F.3d 1192, 1196 (9th Cir. 2007).

Finally, the Court reviews for an abuse of discretion the reasonableness of the sentence. *Gall v. United States,* 552 U.S. 38, 51 (2007). The Court likewise reviews "a condition of supervised release for abuse of discretion." *United States v. Wise*, 391 F.3d 1027, 1031 (9th Cir. 2004).

**ARGUMENT**

## I.    MR. PRESTON'S CONFESSION WAS INVOLUNTARY.

The district court clearly erred in admitting an involuntary confession and relying on that unreliable confession at trial.[13]  "A defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession. . . ." *United States v. Tingle*, 658 F.2d 1332, 1334 (9th Cir. 1981) (quoting *Jackson v. Denno*, 378 U.S. 368, 376 (1964)) (internal citation omitted).  The Fifth Amendment secures, moreover, "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." *Malloy v. Hogan*, 378 U.S. 1, 8 (1964). Consequently, a confession "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of

_____

13.    The district court was asked to reconsider its pretrial voluntariness ruling in light of the trial.  [Sealed ER 597.]

any improper influence." *Id.* at 7 (quoting *Bram v. United States*, 168 U.S. 532, 542–43 (1897)).  The government bears the burden of demonstrating that a confession is voluntary.  *Brown v. Illinois,* 422 U.S. 590, 604 (1974).  On appeal, this Court "'examine[s] the entire record and make an independent determination of the ultimate issue of voluntariness.'" *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981) (quoting *Beckwith v. United States*, 425 U.S. 341, 348 (1976)).

"In short the true test of admissibility is that the confession is made freely, voluntarily, and without compulsion or inducement of any sort." *Haynes v. Washington,* 373 U.S. 503, 513–14 (1963) (internal quotation marks omitted).  This "due process test takes into consideration the totality of all the surrounding circumstances," but focuses on (1) "the details of the interrogation" and (2) "the characteristics of the accused." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).  These two focal points are analyzed in turn and in detail below.

A.     *The Interrogation*

The district court's findings of fact concisely explain the troubling circumstances of the interrogation.  "During the interview, which lasted for about forty minutes, the [agents] did the great majority of the talking."  [ER 95.]  "The agents indicated to Defendant that they were inquiring about a charge of molestation, and that forensic testing eventually would demonstrate that something happened . . . ."  [*Id.*] "Although the crime was alleged to have occurred on September 23, which was a

Wednesday, the agents stated in the interview both that the alleged incident occurred on the 23rd, and that it occurred on 'Friday.'. . . Defendant denied having been at his residence on the previous Friday [because he, in fact, had not been there]. But the agents persisted that they had witnesses that placed the victim at Defendant's residence. Defendant persistently denied being at home on Friday, and he denied doing what his cousin said that he did, whatever that was."[14] [ER 96.] Indeed, the botched dates were so bad that the government itself criticized the agents at trial: "I'm going to tell you, you got some real issues with dates here." [Sealed ER 454; Sealed ER 471; ER 27–63 (telling Mr. Preston at least sixteen times that the alleged offense occurred on a Friday, switching later to a Thursday, and dating the "apology" wrong).]

"The agents stated that they didn't buy Defendant's story and wanted to know what happened" or else they would "return repeatedly to interview Defendant. They further stated that they would turn the results of their investigation over to the United States' Attorney and that office would decide whether to do something with respect to the investigation and that it just wouldn't be good for anyone if Defendant didn't tell them the truth in the interview. Defendant continued to deny that anything happened despite what his accusers thought that he did to his cousin." [ER 96.]

---

14.    Mr. Preston relies on routines. One of his firm routines is that, every Friday, he goes to the flea market and stays the night at his cousin's house. [*See, e.g.*, ER 30; Sealed ER 496.] Friday, in short, is a big day for Mr. Preston, who otherwise stays at home, without transportation, a job, or further schooling to occupy his time.

"In their questioning of Defendant, the agents further emphasized their desire to distinguish whether the accusations against him might have been a one-time act or whether he was a serial child predator. They indicated that help might be available for one-time offenders, but only if such offenders were truthful about their problems. They also represented to Defendant that whatever he shared with them would be imparted to the U.S. Attorney's office, but would go no further." [ER 96–97.] To extend the offer of leniency further, Mr. Preston was promised not to be arrested. [Sealed ER 430.] "During the course of the interview, the agents asked Defendant suggestive questions such as whether it was a one-time event, whether the victim pulled down his own pants, whether Defendant unzipped his own pants or pulled them down, whether Defendant put on a condom, whether and for how long he penetrated the victim, whether he threw the condom away, etc."[15] [ER 97.]

Importantly, then, "[t]he agents admittedly created the impression that if Defendant was guilty of the crime, admitting the guilt could minimize the consequences." [ER 97.] "At the end of the interview the officers wrote out a document which they represented to Defendant could contain his apology to the victim. In the document, the officers summarized the confessions that they had obtained from

---

15.    Tymond did not verbally admit to using a condom. And once the agents kept pushing their story, he again said he did not know what happened. [ER 48.]

Defendant, included an apology to the alleged victim, and had Defendant review and sign the document, which he did."  [ER 97.]

At the subsequent hearing to determine whether Mr. Preston's interrogation and written "apology" were voluntary, Mr. Preston "called Dr. John DiBacco as an expert witness.  Dr. DiBacco offered evidence that the interview technique used by the agents was inappropriate and persistent; and that Defendant may be susceptible to the inappropriate questions and promises made by agents because he is substantially below average in his communication and comprehension skills.  Dr. DiBacco further testified that Defendant has been in special education courses as a result of these poor verbal communications skills.  Under such circumstances Defendant's expert opined, Defendant might have been willing to say what he perceived his questioners wanted him to say to bring the interview to an end."  [ER 97.]

These exact circumstances and techniques can and do lead to involuntary, and often false, confessions.  The path to overbearing the will of an innocent person, particularly one within a vulnerable class, has now been well mapped by social science.  Typically, there are three steps, that is, "[t]hree errors occur in sequence when police elicit a false confession that leads to a wrongful conviction:"[16]

_____

16.    John B. Gould & Richard A. Leo, *One Hundred Years Later: Wrongful Convictions After a Century of Research*, 100 J. CRIM. L. & CRIMINOLOGY 825, 844 (2010) ("It is difficult for the public to understand why someone would confess to a crime that the individual did not commit, but research not only indicates that false

*Step 1.* "The first error occurs when detectives mistakenly classify an innocent person as guilty." *Id.* at 845. Although this factor may seem obvious, it is a prerequisite. In addition to the tunnel-vision that occurs once agents decide that a particular person is guilty, if only guilty defendants were interrogated, we would not have to worry about convicting innocent defendants. *Id.*

*Step 2.* "Once detectives misclassify an innocent person as a guilty suspect, . . . [t]he primary cause of police-induced false confessions is the use of psychologically coercive police interrogation methods." *Id.* at 846. "[T]hey usually consist of implicit or explicit promises of leniency and implicit or explicit threats of harsher treatment in combination with other interrogation techniques such as accusation, repetition, attacks on denials, and false evidence ploys." *Id.* "Even in the absence of promises of leniency or threats of harm, police interrogation may become psychologically coercive if it leads the interrogated suspect to perceive that he has no choice but to comply with the demands of his interrogators." *Id.* at 847 (noting also that "the developmentally

---

confessions occur but also explains how they happen. Several studies of erroneous prosecutions conducted since 1987 have shown that anywhere from 14% to 25% of the cases reviewed involved false confessions. According to the national Innocence Project, approximately two-thirds of the DNA exonerations in homicide cases involved false confessions."). As an ever-increasing body of scholarship has shown, the common sense assumption that the innocent do not "confess" is among the most misguided notions that "common sense" has to offer. *See, e.g.,* Richard A. Leo & Richard J. Ofshe, *The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation,* 88 J. CRIM. L. & CRIMINOLOGY 429 (1988).

disabled, cognitively impaired, juveniles, and the mentally ill—all of whom tend to be unusually suggestible and compliant"—are more likely to confess falsely, a point addressed immediately below). This second critical step is firmly displayed in this record:

- The agents exaggerated the evidence: "we know [you were] here . . . that's not disputable. [T]here were five, six people over there that said" you were here. [ER 33.] We also have "forensic exams, interviews and . . . otherwise, we wouldn't be here." [ER 33, 38–39.] "And the other thing we know too is according to all our previous investigation is that something did happen in [your house on Friday]." [ER 48.]

- They used leading questions and no-win choices: "We have witnesses putting you here. . . . I mean you got to tell me what happened Friday . . . because you have to remember what happened Friday . . . are you molesting little kids?" [ER 42.] "I know you were here. There's other witnesses putting you here. So there's no denying about that. But I'm trying to figure out which . . . person, are you? [I]s it you're preying on little kids?" [*Id.*]

- They used leniency and minimization: "Because if it was a one-time deal, there are other ways, maybe they can help you. There's help out there, but you have to be truthful." [ER 43.]

- They promised more leniency: "We talk to people left and right and we don't say anything about it. It stays with the folder and it stays with the U.S. Attorney's Office *and that's it*. So what happened *Friday*?" [ER 47 (emphasis added).] Immediately after the agents made this promise, moreover, Mr. Preston appeared to adopt their suggestions that John Doe entered Mr. Preston's house that day.[17] [*See id.*]

- They rejected his initial statements, offered leniency again, and suggested a non-responsive answer means guilty in the extreme: "You got to tell me what . . .

_____

17.    *See, e.g.*, *United States v. Hall*, 974 F. Supp. 1198, 1204 (C.D. Ill. 1997) ("[A] major distinguishing factor for false confessions is the interrogator's continued use of coercion either through false accusations or false promises of leniency.").

happened Friday . . . before we could even straighten this whole thing out. . . . And, you know, if you can't really remember. What if you're this other person where you're molesting all these little kids? I mean, how would you know that?" [ER 42.]

▪ They subtly threatened his physical freedom: When Mr. Preston would not agree to their story, the agents asked whether Mr. Preston would rather talk inside the agent's vehicle, which could be interpreted as an offer of privacy, but could also be interpreted as a threat that, if Mr. Preston kept refusing to explain what happened, Mr. Preston would be confined in the agent's vehicle. [*See* ER 95.]

In sum, agents *fifty* times rejected Mr. Preston's answers that he had not been there on Friday (or Thursday), did not know what had happened, and had not done anything wrong. The future consequences for failing to tell them what happened on Friday included repeated questioning and more severe punishment. [ER 36–37.] The agents then told Mr. Preston repeatedly that what had happened could be "explain[ed] away" as a "misunderstanding." [*See, e.g.*, ER 36.] When this tactic did not work in isolation, they made him choose between being a "predator" or engaging in a "one time thing." For the latter, there was "help." [ER 43.] For the former, harsh punishment would follow. They also used a textbook tactic of praising and currying favor with Mr. Preston: "I don't think you're that type of a person [who serially molests little children]." "Yeah, you seem like a pretty good dude." "I mean, you're a young guy. 18 years old." [ER 44–45.] They then promised him that his statements would be kept confidential and not used against him.[18] [ER 47.] Finally, after supplying Mr. Preston

18.    The agents thus used two coercive techniques in excess: (1) maximization

with essentially every detail of the crime, they falsely characterized their written statement, which he "had" to sign, as simply an apology to the victim. *See, e.g.*, *Harrison,* 34 F.3d at 892 (noting that even "subtle psychological coercion can effectively overbear a suspect's free will").

*Step 3.* "Police detectives help create false confessions in the post-admission narrative phase of interrogation by pressuring the suspect to accept a particular account and suggesting crime facts to him, thereby contaminating the suspect's post-admission narrative." John B. Gould & Richard A. Leo, *One Hundred Years Later: Wrongful Convictions After a Century of Research*, 100 J. CRIM. L. & CRIMINOLOGY 825, 849 (2010). "They often use scenario-based inducements as a method of attributing a minimizing motive to the suspect—which the suspect agrees to and then repeats back, even if it is completely inaccurate, because he comes to believe that it will reduce his culpability. Police interrogators will also encourage suspects to attribute their decision

---

(i.e., "making an accusation, overriding objections, and citing evidence, real or manufactured, to shift the suspect's mental state from confident to hopeless" and "communicat[ing] as a means of inducement, implicitly or explicitly, a threat of harsher consequences in response to the suspect's denials"); and (2) minimization (i.e., "offer[ing] sympathy and understanding; normaliz[ing] and minimiz[ing] the crime, . . . and offer[ing] the suspect a choice of alternative explanations—for example, suggesting to the suspect that the murder was spontaneous, provoked, peer-pressured, or accidental than the work of a cold-blooded premeditated killer"). Saul M. Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 LAW & HUM. BEHAV. 3, 12 (2010) (noting further that "the research has shown that this [minimization] tactic communicates by implication that leniency in punishment is forthcoming upon confession").

to confess to an act of conscience, to express remorse about committing the crime, and to provide vivid scene details that appear to corroborate the suspect's guilty knowledge and thus confirm his culpability." *Id.* This third and final step was completed in abundance. The agents fed Mr. Preston every single critical detail of the supposed crime.[19] "Of particular concern, in addition to the general threats and intimidation that may have been employed to overbear Wilson's will, is the fact that the officers relied largely on leading questions to secure this confession from Wilson." *Wilson v. Lawrence County*, 260 F.3d 946, 953 (8th Cir. 2001); *see also Spano*, 360 U.S. at 322 (observing that involuntary confession was extracted, not by narrative, but by "leading questions of a skillful prosecutor in a question and answer confession").[20]

Thus, these three stages destroyed Mr. Preston's will and likely resulted in a false confession (and accompanying "apology"). That conclusion becomes irrefutable in light of Mr. Preston's characteristics.

---

19.   It was all unconvincing and untrustworthy: "One method for checking the authenticity of a voluntary confession, or one that seems to be the result of a mental illness, is to introduce some fictitious aspects of the crime and test whether the suspect will accept them as actual facts relating to the occurrence." FRED E. INBAU ET AL., CRIMINAL INTERROGATIONS AND CONFESSIONS 349 (5th ed. 2011). Mr. Preston, of course, was willing to agree that he committed a crime on Friday (even though he was gone). Yet, the agents never performed any intentional testing for falsity.

20.   The court determined that the leading and overreaching questions clearly violated Wilson's constitutional rights. *Wilson*, 260 F.3d at 953. This was particularly true "in light of Wilson's limited intelligence and mental capacities," which were strikingly similar to Mr. Preston's. *See id.*

*B.    Mr. Preston's Characteristics*

"The Supreme Court has long indicated that one of the key concerns in judging whether confessions were involuntary, or the product of coercion, was the intelligence, mental state, or any other factors possessed by the defendant that might make him particularly suggestible, and susceptible to having his will overborne." *Wilson*, 260 F.3d at 952 (citing *"Colorado v. Connelly,* 479 U.S. 157, 165 (1986) (stating that mental condition is surely relevant to an individual's susceptibility to police coercion); *Spano v. New York,* 360 U.S. 315, 321–22 (1959) (reversing conviction because confession was involuntary because of effect of psychological coercion on suspect who was foreign-born, completed one-half year of high school, and had a history of mental instability); *Fikes v. Alabama,* 352 U.S. 191, 196–98 (1957) (reversing a conviction because the coercion applied against a person who was 'weak of will or mind' deprived him of due process of law")). Mr. Preston also possesses key dispositional risk factors present in the majority of false confession cases: (1) immaturity; (2) intellectual and cognitive disabilities; and (3) personality and psychopathology.[21] Saul

---

21.    *See also* Brandon L. Garrett, *The Substance of False Confessions*, 62 STAN. L. REV. 1051, 1064 (2010) ("Mentally disabled individuals and juveniles are both groups long known to be vulnerable to coercion and suggestion."). Moreover, the vast majority of the confessions contained specific details about the crime that had been fed to the innocent person through agents' questioning, among other avenues, which is a phenomenon known as contamination. *See id.* at 1065.

M. Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 LAW & HUM. BEHAV. 3, 19–22 (2010).  For example, "of the first 200 DNA exonerations in the U.S., 35% of the false confessors were 18 years or younger and/or had a developmental disability" and another study "found that 69% of exonerated persons with mental disabilities were wrongly convicted because of false confessions." *Id.* at 19.  At the age of eighteen, moreover, Mr. Preston was also on the borderline of another high risk category—juveniles.  *Id.* at 19–20.

Mr. Preston has a brain "like a five-year-old." [Sealed ER 479.]  Mr. Preston's IQ is only 65.  [Sealed ER 604; PSR ¶ 36.]  In the government's words, Mr. Preston "has a younger intellect. . . .  He has some mental deficits that we've heard about in this trial, and there's some exhibits." [Sealed ER 590, 642.]  This IQ generally places Mr. Preston in the mentally retarded range.  *Atkins v. Virginia*, 536 U.S. 304, 309 n.5 (2002) ("It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition."); *Columbe v. Connecticut*, 367 U.S. 568, 620 (1973) (holding involuntary the confession extracted from "a thirty-three-year-old mental defective . . . with an intelligence quotient of sixty-four"); *Hummel v. Rosemeyer*, 564 F.3d 290, 298 (3d Cir. 2009) (noting that the defendant had "an I.Q. score of 65, which placed him in the mentally retarded range of intelligence").  Mr. Preston has particularly grave deficits in verbal comprehension,

which is particularly inapt for police interrogations and (as discussed below) rights waivers.

Moreover, Dr. John DiBacco (a well-qualified forensic psychologist with vast experience in proper interviewing techniques and assessment) examined Mr. Preston's interrogation transcript, and he personally examined Mr. Preston. Dr. DiBacco concluded that (1) the agents employed many suggestive statements; (2) Mr. Preston's limited verbal processing skills and IQ rendered him extremely vulnerable to the agents' suggestive and misleading statements; and (3) under these circumstances, it was likely that Mr. Preston made admissions that were inaccurate. [Sealed ER 66–77.]

The agents were thus under a duty to take special precautions when interrogating Mr. Preston. *Henry v. Dees*, 658 F.2d 406, 411 (5th Cir. 1981) ("When persons of markedly limited mental ability . . . are questioned without the aid of counsel, . . . [e]xtra precautions must be taken."). The agents could have, for instance, encouraged the presence a parent or attorney or, at least, given him *Miranda* warnings. Indeed, the absence of *Miranda* warnings in this case weighs against a finding of voluntariness. *See, e.g.*, *Withrow v. Williams*, 507 U.S. 680, 693–94 (1993). The government will undoubtedly tell this Court, however, that the agents did not know about Mr. Preston's grave deficits when they interrogated him. The interrogation itself forecloses the government's argument. Mr. Preston told the agents that he did not understand what the word "disabled" meant, but he then agreed that he was disabled. [ER 40.] He also

25

told them that "they [i.e., John Doe's side of the family] do witchcraft towards us and shit like that" and "sometimes I go crazy." [ER 34–35.] He told them as well about his "short term memory loss" for which he had received medical examination. [ER 39–40.] They also knew that he had been removed from high school. [ER 41.][22] Finally, the agents had spoken with several of Mr. Preston's relatives before they interrogated him. Therefore, when the government proclaims the agents' ignorance, it should ring hollow.

In addition to the problematic characteristics of both the interrogation and Mr. Preston, the district court also based its determination, in part, on a factual error. The district court stated that Mr. Preston "apparently fabricated a nonexistent brain tumor for which he claimed to have received hospital treatment to explain his short-term memory loss and his inability to remember the answers to some questions."[23] The district court's factual reasoning is erroneous in several ways: (1) Mr. Preston said that he has trouble remembering things "like" he has a tumor, but that medical personnel "can't, like, figure out what's going on" with him [ER 39–40]; (2) in any event, there

---

22.    The district court recognized these facts as well: "In response to a question about what happened on that day Defendant indicated that he had a poor short-term memory apparently because of a tumor for which he had received past hospital treatment that had ceased. But Defendant asserted that he remained disabled and as such was not allowed to attend school because of the way he acts." [ER 96.]

23.    The government misstated this testimony in closing as "I have a tumor in my head." [Sealed ER 583.]

was nothing in the record supporting or refuting the existence of a tumor; and (3) the medical diagnostic evidence did show that Mr. Preston had significant cognitive shortcomings. Thus, the district court's basis for its order is demonstrably erroneous.[24]

In light of the problematic interrogation, vulnerable defendant, and erroneous conclusions, caselaw calls for reversal. *United States v. Harrison*, 34 F.3d 886, 891–92 (9th Cir. 1994) ("[T]here are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor."). "Even if Harrison were unusually resistant to psychological coercion—because she," much unlike Mr. Preston, "was a thirty-one year-old woman with two years of college education and had prior exposure to the criminal justice system"—"the technique used here risks overcoming the will of the run-of-the-mill suspect." *Id.* at 892 (citing *Tingle,* 658 F.2d at 1335) (internal quotation omitted); *see also United States v. Lopez*, 437 F.3d 1059, 1065 (10th Cir. 2006) (holding involuntary a one-hour long confession in light of promises and exaggerations about evidence). With the exception of being two years *younger*,

---

24.    The district court also was unjustifiably dismissive of the doctor's testimony: "While Dr. DiBacco identified suggestive questions that were used in the interview of Defendant, he identified none that were 'leading.'" [ER 100.] Yet, the interview is riddled with both leading and loaded questions. [*E.g.*, ER 49 ("What did he do pull his pants down?"), *id.* ("You just unzipped your zipper."), 50 ("Well did he put the condom on or did you?"), *id.* ("You just put your penis in all the way or just a little bit?"), 42 ("Are you molesting all these kids?"), 41–42 ("But I'm trying to figure out which . . . person [i.e., a serial molester or a one-time experimenter] are you?").]

moreover, Mr. Preston is similarly situated to the defendant in *Wilson*: "Through their investigation, the appellants discovered that Wilson was twenty years old, still lived at home, worked occasional odd-jobs, was mentally impaired, had attended mostly, if not exclusively, special education classes in high school and that some people believed he could be 'talked into anything.'" *Wilson v. Lawrence County*, 260 F.3d 946, 949 (8th Cir. 2001); *see also id.* n.4 ("Subsequent testing of Wilson indicates," as it does with Mr. Preston, "his overall mental abilities are in the bottom two percent of the population and that his adaptive behavior (communication, daily living skills, etc.) is in the lowest one percent of the general population.").

Finally, in light of the totality of the circumstances, the government cannot carry its burden of showing that Mr. Preston's statements were voluntary, and the district court erred in refusing to suppress them. Nor may the admission of Mr. Preston's involuntary confessions be dismissed as "harmless error." Given the centrality of the confession to the government's case against Mr. Preston, the government cannot prove "beyond a reasonable doubt that the error . . . did not contribute to the verdict obtained." *Harrison,* 34 F.3d at 892; *see also id.* (noting the "qualitative impact" of allowing the fact-finder to hear "in [the defendant's] own words" how he committed the crime charged). The improper admission of Mr. Preston's involuntary confessions requires that his conviction be reversed. *See id.* at 893.

## II. MR. PRESTON'S WAIVERS OF HIS RIGHTS TO A JURY TRIAL, INDICTMENT, AND CONFRONTATION WERE INVOLUNTARY.

"[T]he defendant must be competent to waive the jury right, and the waiver must in fact be voluntary, knowing, and intelligent." *United States v. Christensen*, 18 F.3d 822, 824 (9th Cir. 1994). "The suspected presence of mental or emotional instability eliminates any presumption that a written waiver is voluntary, knowing or intelligent." *Id.* at 826. The district court must conduct "more than a competency determination: whereas competency goes to a defendant's *capacity* in general, '[t]he purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision.'" *Id.* (quoting in part *Godinez v. Moran,* 509 U.S. 389, 401 n.12 (1993)). There is no way that the jury waiver in this case complied with this standard. *Id.* ("hold[ing] that . . . in cases where [district courts] have reason to suspect a defendant may suffer from mental or emotional instability," the district courts must complete "an in-depth colloquy which reasonably assures the court that under the particular facts of the case, the signed waiver was voluntarily, knowingly, and intelligently made").

Although the district judge was clearly conscientious, the transcript from the waiver proceeding is, frankly, a mess. [*See* ER 136–76.] That record manifestly reflects that Mr. Preston understood none of the fourfold "guidelines" for ensuring that the waiver was knowing, voluntary, and intelligent:" (1) twelve members of the

community compose a jury, (2) the defendant may take part in jury selection, (3) a jury verdict must be unanimous, and (4) the court alone decides guilt or innocence if the defendant waives a jury trial." *United States v. Duarte-Higareda*, 113 F.3d 1000, 1002 (9th Cir. 1997). Mr. Preston got several questions wrong, and the district judge eventually gave up asking anything but "yes or no" questions. [*See, e.g.*, ER 148–54.] Trial counsel's frequent, off-the-record explanations for Mr. Preston were insufficient to show that Mr. Preston, "in fact," understood. *Cf. United States v. Duarte-Higareda*, 113 F.3d 1000, 1002–03 (9th Cir. 1997) (concluding that assurances of defense counsel, but not defendant, insufficient to constitute a knowing, voluntary, and intelligent jury trial waiver); *United States v. Bailon-Santana*, 429 F.3d 1258, 1260–61 (9th Cir. 2005) (concluding, similarly, that defense counsel's assurances were insufficient).

This case also presents a troublingly—albeit unintentionally—coercive atmosphere. The government initially charged Mr. Preston with a crime carrying a minimum sentence of thirty years in prison. [*See* ER 7.] When Mr. Preston persisted in his right to a jury trial, the government began to chip away at his procedural protections. First, it told Mr. Preston that it would drop this thirty-year mandatory minimum charge and recommend no more than fifteen years in prison if (and only if)

Mr. Preston waived his rights to a jury trial and indictment.[25] [*See* ER 129, 132.] This waiver, apparently, did not weaken Mr. Preston's case enough. The government then told Mr. Preston that it would recommend, at most, ten years in prison if he waived his right to confrontation of the most important witness against him, John Doe. [ER 197, 204.] Mr. Preston, who could not understand the workings of these protections, could at least feel the coercion: *If he exercised his constitutional rights, he would face thirty years in prison; if he waived those rights, he would likely face ten, at most. Cf. Morris v. Maryland*, 13 A.3d 1206 (Md. 2011) (concluding that an agreement to waive several trial rights in exchange for a sentencing cap was the functional equivalent of a plea bargain, if not a "sham trial;" holding that the agreement violated *Crawford*).

As the Court knows well, there are many crimes carrying lengthy prison sentences. Without judicial regulation, each of these crimes also carries a danger for constitutional rights (and even more troublingly, for constitutional rights designed to ensure a fair trial). Consider, for example, a crime carrying a thirty-year mandatory minimum: The government could take that thirty years, divide it up into two-year bargaining chips, and "buy" waivers of every single constitutional right. It could, just as an example, reduce the charge or sentencing recommendation by two years for

---

25. To its credit, the government was absolutely right not to seek thirty years in this case. It should have done so, however, without demanding that the defendant surrender several constitutional rights in return. This demand allowed the government to wound Mr. Preston's defense and his procedural rights at trial.

waiving the right to counsel, another two years for waiving the right to indictment, another two years for waiving the right to a jury, another two years for waiving the right to confrontation, and another two years for waiving the right to testify. The problem is not about quid pro quo: the defendant would indeed receive ten less years in prison, and the prosecution would receive a smoother path to conviction. The problem is that certain things should not be for sale, at least not without additional precautions.

"[A]lthough bearing a different label," the jury trial waiver in this case "is sufficiently similar to a plea agreement that . . . it is appropriate to employ the same standard of review." *United States v. Coleman*, 208 F.3d 786, 791 (9th Cir. 2000). Perhaps most tellingly, the government itself referred to the arrangement as a "plea agreement." [ER 133.][26] Thus, as with plea proceedings, further procedural protections are necessary. *Cf. United States v. Jenkins*, 504 F.3d 694, 700 (9th Cir. (2008) (noting the need for a "'prophylactic' doctrine . . . designed, in part, 'to prevent chilling the exercise of [legal] rights by other defendants who must make their choices under similar circumstances in the future.'").

Rule 11 requires that "[b]efore the court accepts a plea of guilty . . . the court must address the defendant personally in open court," and "[d]uring this address, the court must inform the defendant of, and determine that the defendant understands" that

---

26.    Someone later crossed out the words "plea agreement" and wrote in "trial waiver." [*See* ER 133.]

he is surrendering, fundamental rights. FED. R. CRIM. P. 11(b)(1); *see also Boykin v. Alabama*, 395 U.S. 238, 243–44 (1969) ("What is at stake for an accused facing . . . imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence.") (internal citation and footnote omitted). For example, Rule 11 requires the district court:

> (1) to inform the defendant of his trial rights and anticipated sentencing details, Rule 11(b)(1);
>
> (2) to "address the defendant personally in open court and determine that the plea is voluntary and did not result from force, threats, or promises (other than promises in a plea agreement)," Rule 11(b)(2); and
>
> (3) to "determine that there is a factual basis for the plea," Rule 11(b)(3).[27]

None of these safeguards were observed below. *See, e.g.*, *United States v. Arellano-Gallegos,* 387 F.3d 794, 797 (9th Cir. 2004) ("Because this was not a technical violation of Rule 11, but rather a wholesale omission, and there is nothing elsewhere in the record to indicate that Arellano understood the right to appeal his sentence, his substantial rights were affected."); *United States v. Murdock*, 398 F.3d 491, 496 (6th Cir. 2005) (holding that a "wholesale omission" of the district court's Rule 11 obligation constitutes plain error). Indeed, there was not even a brief colloquy over

---

27.     Requiring some factual basis before waiving procedural protections would provide some assurance that an innocent person was not waiving his rights in fear of the lengthy possible prison term (should the jury or judge fail to acquit).

Mr. Preston's waiver of his right to confrontation—even though he was waiving his right to confront the government's key witness. There, apparently, was a signed waiver, but that waiver does not appear in the record. These absences warrant reversal in and of itself. [*See* Sealed ER 99.]

Without these procedural protections, this practice of buying constitutional rights designed to ensure a fair trial violates due process, the Fifth and Sixth Amendments, and the Federal Rules of Criminal Procedure. In addition to these constitutional and rule-based authorities, the Court's supervisory authority would permit it to regulate this practice.

## III.   THE EVIDENCE WAS CONSTITUTIONALLY INSUFFICIENT AND MISLEADING.

The evidence was (A) constitutionally insufficient, (B) irrelevant and prejudicial; and (C) improperly argued.

### A.   *The Evidence Was Insufficient*

"In reviewing a sufficiency of the evidence claim, the central inquiry is whether, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Rios*, 449 F.3d 1009, 1011 (9th Cir. 2006) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "It would not satisfy the [Constitution] to have a j[udge] determine that the defendant is *probably* guilty." *Sullivan v. Louisiana*, 508

U.S. 275, 278 (1993). The government had the burden of establishing beyond a reasonable doubt the following four elements: (1) Defendant, an Indian, 18 U.S.C. § 1153(a), (2) knowingly engaged in abusive sexual contact, § 2244, (3) with "an individual who has not attained the age of 12 years," § 2244(c), and (4) within Indian country, § 1153(a). With respect to element (2), the government had to prove that Mr. Preston "knowingly engaged in sexual contact with the victim's buttocks or anus with [his] penis, and [he] had an intent to abuse, humiliate, harass, degrade or arouse the victim or gratify [his] sexual desire."

There is simply no evidence—none—that Mr. Preston "had an intent to abuse, humiliate, degrade or arouse the victim or gratify [his] sexual desire." Indeed, the only evidence in the record is directly opposed: Mr. Preston was asked—in the same interview-turned-interrogation that the government will urge this Court to believe— whether he had any "urge" to do this: He not only answered "no" but that he had no idea what happened. [*See, e.g.*, ER 56–57.] This lack of motive further proves the false confession. *See* FRED E. INBAU ET AL., CRIMINAL INTERROGATIONS AND CONFESSIONS 349 (5th ed. 2011) ("Almost all truthful voluntary confessors will be able to articulate a specific and reasonable motive that led them to come forward. . . . Conversely, a person offering a voluntary false confession is apt to respond in vague terms as to why he decided . . . to confess.").

It is also dubious to conclude that any sexual contact occurred. First, as shown above, any admissions on Mr. Preston's part were coached and involuntary. In any event, "[i]t is beyond dispute that a criminal defendant's conviction cannot rest entirely on an uncorroborated extrajudicial confession." *United States v. Stephens*, 482 F.3d 669, 672 (4th Cir. 2007); *United States v. Norris*, 428 F.3d 907, 915 (9th Cir. 2005) (reversing because the "evidence does not sufficiently corroborate Norris's confession regarding the sexual misconduct"). Second, John Doe's statement was chiefly imaginary and uncorroborated by the physical evidence.[28] *See, e.g.*, *United States v. Reddest*, 512 F.3d 1067, 1073 (8th Cir. 2008) (finding insufficient evidence of a sexual misconduct count and declining to adopt the government's variance between indictment and proof at trial). The district court gave only passing notice that all of the swabs taken from John Doe's anus, genitals, mouth, and body excluded Mr. Preston, notwithstanding Doe's story.

Moreover, John Doe also tells stories about Mr. Preston sexually abusing Doe's sixteen-year-old sister, who lives in Doe's house. [Sealed ER 259.] Mr. Preston never abused Doe's sister, however, and there have never been even accusations to the contrary. Doe's sister was allegedly abused, however, by Doe's stepfather, Harold

---

28.    The district court essentially so found in its findings of fact. [ER 190–91 ¶¶21–22.]

Yazzie. [Sealed ER 259, 465–66.][29] Surprisingly, Yazzie's DNA was never tested in this case.[30] [*See* Sealed ER 286.]

In addition to the lack of evidence noted above, the sparse scientific evidence (DNA) was irrelevant, prejudicial, and misleadingly used.

### B.    *The Evidence Was Irrelevant and Unduly Prejudicial.*

The Federal Rules of Evidence require relevance. FED. R. EVID. 401, 402. The rules of evidence add a fundamental filter, Rule 403. Whether fact, expert, or otherwise, all evidence is subject to Rule 403's balancing test: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." FED. R. EVID. 403. Moreover, Rule 702 requires that expert "testimony is the product of reliable principles and methods, and . . . the expert has reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702. The government and its DNA analyst drifted far from these rules in their DNA presentation.

---

29.    The government has obtained an indictment against Yazzie for aggravated sexual abuse. *United States v. Yazzie*, No. 3:10-CR-08183-DGC (D. Ariz. Sept. 28, 2010) (superseding indictment on Feb. 15, 2011).

30.    In any event, the prosecution's forensic witness acknowledged that, had John Doe seen his sister being sexually abused by Yazzie or someone else, that fact could have affected the Doe's statements in the interview. [*See* Sealed ER 259.]

First, the DNA analyst went below her lab's quality threshold. [Sealed ER 301.] Second, the government convinced the DNA analyst to run irrelevant statistical hypotheses, involving a highly unlikely scenario in which John Doe's own DNA would not be present in his own underwear. [Sealed ER 309–11, 339–40.] The expert acknowledged that the hypothesis and resulting testimony were irrelevant. [*Id.* 339–40.] Third, the population statistics were plainly inappropriate for this cluster of relatives.[31] This Court has warned of the dangers with probability statistics, especially with the Navajo population, and suggested that Rule 403 may require exclusion.[32]

---

31.    *See generally People v. Collins,* 438 P.2d 33 (Cal. 1968) (rejecting assumptions about the statistical probability of a couple other than the defendants having committed the crime being 1 in 12 million because several of the probabilities multiplied together, such as hair and eye color, were interdependent). Because of the interdependence of relatives' DNA, the population statistics were erroneously applied.

32.    "Of particular concern is where the Government seeks to present probability testimony derived from statistical analysis, the third main phase of DNA profiling. Numerous hazards attend the courtroom presentation of statistical evidence of any sort. Accordingly, Rule 403 requires judicial vigilance against the risk that such evidence will inordinately distract the jury from or skew its perception of other, potentially exculpatory evidence lacking not so much probative force as scientific gloss." *United States v. Chischilly*, 30 F.3d 1144, 1156 (9th Cir. 1994). "Although the fact that certain alleles occur more frequently in the Navajos than they do in European and West African populations is of little consequence for a crime committed in Boston, where few Navajos reside, this fact is of considerable consequence for a crime committed on a reservation in Arizona, where many Navajos make their home. In such instances, the troubling possibility arises with singular force that the product rule, founded on the questionable premise of allelic independence at different test sites, will understate the random probability that some other nearby resident with a similar genetic profile could have been the source of the sample found on the victim." *Id.* at 1157–78.

Fourth, and finally, both the government and district court erroneously used the DNA population statistics. The government used the statistics incorrectly, equating the presence of five alleles in a multi-person mixture as ruling out 99.8% of the Navajo population.[33]    [Sealed ER 578.]    The 99.8% statistic suggests, rather, that (in probability) .2% of unrelated Navajo Native Americans would have the same profile as Mr. Preston.[34]    The government then compounded this error by claiming it means a "one in 10 billion" chance.  [*Id.*]  The district court, which admittedly had little DNA experience, was swayed by the prosecution's assertions.   The prosecution, in comparison, touted its experience with DNA, both before and during trial. [ER 164–65, 169.] The district court sided with the government: "Nevertheless, even assuming that the victim, Carolyn Begay and [John Doe's friend] were all contributors to the DNA sample, there are still unexplained alleles at five of the thirteen loci in the DNA sample.  The DNA of Defendant provides each of those five unexplained alleles.

---

33.    It is interesting because the original prosecutor thought that the population statistics were dubious because of the cousin relationship between Mr. Preston and John Doe: "whereas I think [the former AUSA in charge of the case] once thought that that statistic was invalid because of the cousin relationship, I talked to the DNA analyst, and she says she does not agree with that. [T]hey don't have a close enough relationship to make this statistic insignificant."  [RT 2/25/11 at 4.]

34.    Earlier in the case, the government did correctly describe the statistic: "Well, the probabilities in the report are that the likelihood of finding this genetic pattern is one in 530 Navajos, of unrelated Navajos."  [ER 165; RT 2/17/11 at 30.]

Given the presence of the five alleles, 99.8% of the general Navajo population can be excluded as possible contributors of such DNA." [ER 189.]

This finding of fact reveals two demonstrably erroneous conclusions: (1) it ignores that at least one unidentified contributor—in addition to those just listed by the district court—placed alleles on or in the victim's underwear; and (2) the 99.8% statistic suggests only that this percentage of randomly selected, unrelated Navajo Native Americans is unlikely to have the exact same DNA profile as Mr. Preston—the presence or absence of alleles at only five loci would yield a significantly lower percentage. If either (or both) of these erroneous conclusions were corrected, then, the district court would have been much less statistically confident in reaching its verdict.

This district court added to these prejudicial errors by accepting (at the prosecution's invitation) the well-documented "prosecutor's fallacy:" "the existing evidence demonstrates that it is very improbable that the source of the unidentified DNA is anyone other than Defendant;" excluding the (involuntary) confession, however, the only "evidence" that the district court mentions is DNA evidence.[35] [ER

---

35.    *See generally United States v. Chischilly*, 30 F.3d 1144, 1157 (9th Cir. 1994) ("The FBI matching statistic does not represent source probability. Rather, the test results reflect the statistical probability that a match would occur between a randomly selected member of the database group and either the evidentiary sample or the defendant. To illustrate, suppose the FBI's evidence establishes that there is a one in 10,000 chance of a random match. The jury might equate this likelihood with source probability by believing that there is a one in 10,000 chance that the evidentiary sample did not come from the defendant. This equation of random match probability with

189–90 (listing four reasons, three of which were DNA-related.]  Even considering

only the Navajo Nation (which is the large region of the Southwest in which this crime

allegedly occurred, but which holds only half of the general Navajo population),[36] and

even ignoring close blood relation, 566 Navajo Native Americans probably have Mr.

Preston's DNA profile.  Statistically, each one those 566 Native Americans was

equally likely to have committed the crime, if any.  Thus, the 99.8% is actually flipped:

there is a .2% probability (1/566) that Mr. Preston was the DNA's source, and even if

he had been the source, being the DNA's source was not equivalent to being guilty.[37]

To be sure, other evidence implicating a particular defendant can alter the probability,

but as noted, the district court only pointed to the involuntary confession as that other

evidence.

Moreover, the district court assumed that no other related individual could have

been the DNA's source: "no other person living in the home of either the victim or

Defendant could apparently be the source of the unexplained alleles in the DNA

pattern." [ER 190.]  In addition to the general fact that related individuals lived in and

---

source probability is known as the prosecutor's fallacy.").

36.    Bill Donovan, *Census: Navajo Enrollment Tops 300,000*, NAVAJO TIMES,
July 7, 2011.

37.    This case is a good example of the innumerable variations: Because all of
the swabs were negative for semen or sperm, and because the DNA may have come

all around these two families, and in addition to the fact that an offender did not have to live in either home in order to touch John Doe, neither (1) Mr. Preston's brother (who was home when agents interviewed Mr. Preston eight days later), nor (2) his mother, nor (3) his father were tested.

C.    *The Evidence Was Improperly Argued.*

The evidence was thus far insufficient, irrelevant, and prejudicially used, and consequently, reversal would be warranted at this point.  It is important to add in conclusion, however, that the government further contaminated the evidence through several improper comments.

First, the government capped off its DNA presentation by vouching for its DNA analyst: "I would also ask Your Honor to weigh the credibility of the DNA examiners and look at Kristen Dick, who is an analyst working in the public sector and has no motive to do anything other than to tell the truth." [Sealed ER 581.] *See, e.g.*, *United States v. Weatherspoon,* 410 F.3d 1142 (9th Cir. 2005) (finding that vouching constituted plain error); *United States* v. *Combs,* 379 F.3d 564 (9th Cir. 2004) (same). The government also boosted its own credibility by referring to itself as a "DNA expert:" "And the evidence is, the testimony is that just at one allele, at one single allele, *we*, as DNA analysts and experts, are prepared to exclude people. If *we* only use

_____

from the outside waistband of John Doe's underwear, the presence of Mr. Preston's DNA profile is only minimally suggestive of legal guilt.

42

one allele, *we* can – *we* can make an absolute exclusion. [Sealed ER 576–77 (emphasis added); *see also* ER 164–65, 169 (telling judge about prosecutor's experience with DNA cases and explaining to him fundamental principles of DNA analysis).]

Second, the government kept arguing chronic sexual abuse, which was unnecessary to the charge and not in evidence. [Sealed ER 562–67.] The government continued to declare chronic sexual abuse even in the face of the judge's pre-trial and trial resistance to this unproven, prejudicial theory.

Third, the government injected several irrelevant and incendiary considerations in the case: "This case is about the scrutiny and the spotlight that victims and their families undergo when a child sexual abuse is reported, and this case is about the fact that a defendant has a right to fight and maintain his plea of not guilty, even in the face of extensive evidence of guilt, because this case is about extensive evidence of guilt, and guilt beyond a reasonable doubt." [Sealed ER 560–61.] It is also characterized Mr. Preston in an unduly prejudicial way: He "doesn't go to school because he's been kicked out of school. He doesn't go to work. He stays at home, watches pornography, and smokes marijuana, getting all sexually charged up, and desire meets opportunity." [Sealed ER 591.]

Finally, the government improperly suggested (probably inadvertently) that defense counsel was part of a plan to manufacture evidence, commented on Mr. Preston's silence, and effectively called Mr. Preston's mother a liar:

- The government implied that the defense counsel, Mr. Preston, and possibly also Mr. Preston's mother "contrived" a story: "if we kick him in the butt, then we can explain buttocks pain." [Sealed ER 568.] *See, e.g.*, *United States v. Rodrigues*, 159 F.3d 439, 451, *amended*, 170 F.3d 881 (9th Cir. 1999) (concluding it is improper to suggest that defense counsel is deceiving the fact-finder).

- This inflammatory argument above is punctuated by a comment on Mr. Preston's silence: "What is important of the defendant's statements is not only what is in his statement but what is not in his statement." [Sealed ER 589.] And from this, it gets worse. That silence arguably became a fabricated lie involving the defense team: "And there's nothing about an Xbox or being kicked in the butt, because that never happened; because that is a contrived story that was later developed in December of 2001 [sic] over a year after."

- The team needed to fabricate an assault (of a non-sexual nature) on the victim: "Okay, we gotta explain the fact that this kid's crying, 'cause everybody knows he's crying. And to grasp at straws to develop a motive for this kid to lie. And even the motive is lame. And here's how it goes: [John Doe] is alleging sexual abuse because [John] broke Tymond's Xbox. It just doesn't even ring true." [Sealed ER 589.]

- The government resumes these themes in its reply: "We have this – this Xbox. It's a contrived defense theory to try to explain the fact that the victim was in the house, the fact that the victim was upset, and that the victim had a sore buttock. And this story was never told to law enforcement." [Sealed ER 639.]

- Later the government particularly targets Mr. Preston's mother and suggests that she convinced a witness to lie: "Genevieve's going, Look, you know, your good buddy here, your good buddy's not coming back to you. You know, can you throw me a bone here? Can you give me something?" [Sealed ER 639.] "We know that that is a lie." [Sealed ER 647.]

Thus, the already insufficient and misleading evidence was tainted by the government's improper arguments. *See, e.g.*, *Rodrigues*, 159 F.3d at 451 (reversing in part because the government made material misstatements in closing argument); *United*

*States v. Azubike*, 504 F.3d 30, 38–42 (1st Cir. 2007) (reversing in part because the government misquoted the defendant and noting that such errors are particularly prejudicial in closing arguments because they are "the last words spoken").

## IV.    THE DISTRICT COURT ADMITTED HEARSAY IN VIOLATION OF THE RULES OF EVIDENCE AND THE CONFRONTATION CLAUSE.

The government led off its case with the hearsay testimony of the John Doe's relatives, who claim to have heard and accurately recounted Doe's excited utterances on September 23, 2009.  [*See* Sealed ER 127–28; 140.]  Similarly, the agents were allowed to, and did, testify to what Jeffrey Begay, Carolyn Begay, and John Doe had said.  There was no pressing emergency at the time of their statements, and these witnesses all were presumably available at the time of trial.  It was against both the hearsay rules and the Confrontation Clause, then, to allow them to recount: (1) that Mr. Preston had "molested" John Doe; (2) that approximately three hours earlier, Mr. Preston "had pulled [John Doe] into the residence and told him to pull his pants down;" (3) that John Doe said his "butt hurt;" and (4) that John Doe said Mr. Preston "put his dick in my butt." [Sealed ER 409–11 (overruling hearsay objection).][38] FED. R. EVID.

---

38.    The district court, to its credit, did retroactively strike some of the double hearsay (i.e., what some young boys said that John Doe had told them), but it did not strike John Doe's out of court statements (as recounted through the agent) or those of Carolyn Begay.  [*See* Sealed ER 414–15.]

803(2) (permitting a "statement relating to a startling event or condition," but only if it was "made while the declarant was under the stress of excitement that it caused").

Mr. Preston's mother was home the entire day due to a documented illness. She did leave, however, for an "hour or so" at 2:00 p.m., and when she returned (between 3:00 and 3:30 p.m.), she saw John Doe and his companion in front of Mr. Preston's home, "cussing." [Sealed ER 491–92.] Thus, because John Doe and his grandparents did not utter their accusations until five hours later, there legally was no excitement left.[39] *Winzer v. Hall*, 494 F.3d 1192 (9th Cir. 2007) (holding that a statement made several hours after the startling event was not a spontaneous or exited utterance); *see also Crawford v. Washington,* 541 U.S. 36 (2004) (concluding that the Confrontation Clause generally bars out-of-court testimonial statements); *United States v. Green*, 556 F.3d 151 (3d Cir. 2009) (rejecting the present-sense impression hearsay exception for a statement made fifty minutes after transaction). There is simply no testimony refuting this timing.[40]

---

39.    The grandmother did not receive word that something might be wrong until 7:30 p.m. [RT 5/25/11 at 316.] She did not make the call for another forty minutes (8:08 p.m.). [RT 5/25/11 at 315.]

40.    Finally, the district court clearly erred in implying that Mr. Preston's mother was lying about being home all day. According to the district court, because she did not answer the door for the police officer, and she has a small house, she must have been lying about being home "all day." [ER 195; *see also* Sealed ER 647–48 (feeding this erroneous reasoning to the district court).] This conclusion is clearly erroneous for two reasons: (1) the officer did not visit her house until *8:30 at night—*

These hearsay admissions plainly prejudiced Mr. Preston. In weighing whether John Doe's statements were credible, for example, the district court noted favorably that "the excited utterances made by victim both to his grandparents and the medical personnel were that Defendant inserted his penis into the victim's butt." [ER 192.] The government, moreover, touted these excited utterances and their "reliability" in closing: "We have excited utterances to grandmother and Jeffrey that: Tymond put his pee-pee in my butt." [Sealed ER 567–68, 591 (referring again to the credibility of the allegation; commenting that hearsay "rang true" to grandmother).]

Therefore, the district court erred by admitting these hearsay statements and transgressing the Confrontation Clause. *Winzer*, 494 F.3d at 1200–01 (reversing and noting that the mere fact that an out-of-court witness is upset when s/he is speaking does not make the statement a reliable excited utterance).

## V.   MR. PRESTON'S SENTENCE OF LIFETIME SUPERVISED RELEASE WAS BOTH PROCEDURALLY AND SUBSTANTIVELY UNREASONABLE, AND THREE OF HIS SUPERVISED RELEASE CONDITIONS WERE ALSO UNREASONABLE.

When the district court sentenced Mr. Preston to *lifetime* supervised release, that decision was both procedurally and substantively unreasonable. Procedurally, the district court gave no reasons to justify a life sentence. Substantively, a life sentence is unreasonable in light of the one-time nature of this offense [ER 193 at ¶9], the weak

---

hardly during the "day;" and (2) just because a person chooses not to answer the door for an unscheduled visitor (particularly at 8:30 p.m. and again after 9:00 p.m.) hardly

evidence of guilt, and Mr. Preston's youth and immaturity. The district court then followed this error by issuing three impermissibly vague release conditions.

To avoid procedural error,[41] the Court must explain why "an unusually harsh sentence is appropriate in a particular case with sufficient justification." *United States v. Carty*, 520 F.3d 984, 992 (9th Cir. 2008) (en banc); *cf. Gall,* 552 U.S. at 50 (noting that it is "uncontroversial that a major departure should be supported by a more significant justification than a minor one.").

To avoid substantive error, the prime directive is that "[t]he court shall impose a sentence sufficient but *not greater than necessary*" to accomplish the purposes of 18 U.S.C. § 3553(a) (emphasis added). "The overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional

---

means that she was lying about being home all day.

41.    "It would be procedural error for a district court to fail to calculate—or to calculate incorrectly—the Guidelines range; to treat the Guidelines as mandatory instead of advisory; to fail to consider the § 3553(a) factors; to choose a sentence based on clearly erroneous facts; or to fail adequately to explain the sentence selected, including any deviation from the Guidelines range." *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc).

treatment." *Carty,* 520 F.3d at 991 (citing 18 U.S.C. § 3553(a)(1)-(7)); *see* 18 U.S.C. § 3583(c) (referring to § 3553(a) factors)).

In light of these standards, the sentencing hearing clearly betrays that the district court neither (1) remained cognizant of these factors and the Guidelines throughout the process, *Gall,* 552 U.S. at 50 n.6, nor (2) explained why the maximum term was necessary (whereas a supervised release term of only five years would have been statutorily sufficient), nor (3) discerned a sentence that was substantively reasonable under the factual circumstances and the § 3553(a) factors.

In this case, the district court gave *no* on-the-record thought to the lifetime term of supervised release.  Equally clear, the district court did not consider the specific characteristics of Mr. Preston when determining the supervised release term.  *See, e.g.*, *United States v. Amezcua-Vasquez,* 567 F.3d 1050, 1056–57 (9th Cir. 2009) (vacating and remanding sentence as substantively unreasonable in light of the "defendant-specific facts," notwithstanding that the district court had correctly calculated the Guidelines and enhancements).  Mr. Preston was only eighteen, mentally impaired, had no prior record, and committed a single, brief offense (if any).  *Cf. United States v. Cope*, 527 F.3d 944, 951–52 (9th Cir. 2008) (holding that a lifetime sentence of supervised release was reasonable in part because of defendant's advanced age and because he had previously committed a sexual offense).  Therefore, the lifetime term of supervised release should be vacated.

In addition to the problematic term of the supervised release, the district court imposed three problematic release conditions.  These conditions were unreasonable, vague, overbroad, and in violation of Mr. Preston's due process and First Amendment rights.[42]  In addition to limited First Amendment rights, Mr. Preston "has a separate due process right to conditions of supervised release that are sufficiently clear to inform him of what conduct will result in his being returned to prison."  *United States v. Guagliardo*, 278 F.3d 868, 872 (9th Cir. 2002) (holding "pornography" ban unconstitutionally vague).

Because of the procedurally improper way in which these conditions were imposed (namely, without notice of intent to impose these conditions and without on-the-record reasons for imposing them), each of the three conditions will need to be vacated.  *United States v. Cope*, 527 F.3d 944, 951–52 (9th Cir. 2008) (concluding that "a remand is necessary because the district court failed to provide Cope and his counsel with notice of the special conditions requiring Cope, as part of his sex offender

---

42.    18 U.S.C. § 3583(d), moreover, requires that each condition "(1) is reasonably related to the factors set forth in section 3553(a)(1) [i.e., "the nature and circumstances of the offense and the history and characteristics of the defendant"], (a)(2)(B), (a)(2)(C), and (a)(2)(D) [i.e., the need for the sentence imposed—(B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner")]; [and] (2) involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D)."

treatment program, . . . to submit to plethysmograph, polygraph, and Abel testing. Because these conditions of supervised release are not contemplated by the Sentencing Guidelines, the district court was required to provide notice before imposing them."). In addition to the lack of notice, the Court "must remand this case back to the district court because it did not articulate, on the record, the necessary *Weber*[, 451 F.3d 552, 567–69 (9th Cir. 2006)] findings with regard to the condition requiring [Mr. Preston] to submit to plethysmograph testing." *Id.* at 954, 958 (requiring "specific, medically informed findings on the record"). Each condition also contains its own fatal substantive error.

First, the district court ordered that Mr. Preston "attend and participate in plethysmograph testing as directed by your probation Officer." [ER 5.][43] As noted, this highly intrusive (and controversial) procedure requires significant justification; none appears in the record. *Cope*, 527 F.3d at 954.

Second, the district court ordered that Mr. Preston "shall not possess, view, or otherwise use *any other material* that is sexually stimulating, sexually oriented, or *deemed to be inappropriate* by the probation officer and/or treatment provider. You will submit any records requested by the probation officer to verify your compliance with this condition. *You shall not enter any location where the primary function is to*

---

43.    The presentence report was apparently the source of each of the three unreasonable and unconstitutional conditions.

*provide these prohibited materials*."  [ER 5 (emphasis added).]   Obviously, this condition gives Mr. Preston no meaningful notice as to what "inappropriate" or "sexually oriented" materials he may not possess and what "inappropriate" or "sexually oriented" places he may enter.  *United States v. Cope*, 527 F.3d 944, 957–98 (9th Cir. 2008) (holding that a condition banning "any materials . . . depicting and/or describing child pornography" needed clarification in several ways on remand; the defendant "cannot be left to guess about the intended meaning of the terms of his supervised release.") (internal quotation omitted).

Third, and finally, the district court ordered that "You shall not be *in the company of* or have contact with children under the age of 18 without prior approval of the probation officer."  [ER 5–6 (emphasis added).]  This condition effectively means that Mr. Preston can go nowhere (e.g., malls, gas stations, grocery stores) without, somehow, obtaining prior approval of a probation officer each time.  *See, e.g.*, *United States v. Guagliardo*, 278 F.3d 868, 872 (9th Cir. 2002) (holding a condition that defendant "not reside in 'close proximity' to places frequented by children . . . vague because it leaves 'close proximity' undefined").

In sum, Mr. Preston's lifetime term of supervised release, along with the three vague conditions, should be vacated.

## CONCLUSION

The agents extracted a psychologically coerced confession from an isolated, mentally impaired youth. The district court erred by not suppressing it. When Mr. Preston then asserted his trial rights, the district court allowed those rights to be bargained away without a knowing waiver and without adequate procedural protections. Having bought several constitutional rights from Mr. Preston (e.g., right to a jury and right to confrontation), the government eased its path to victory, but even then, it still failed to present constitutionally sufficient evidence and to do so in a proper manner. Finally, the district court imposed the longest supervised release term possible (life), without notice or justification, coupled with three impermissibly vague release conditions. Therefore, Mr. Preston asks this Court to reverse and remand with directions to vacate the judgment of conviction, the sentence, and the guilty verdict upon which the conviction is based.

**RESPECTFULLY SUBMITTED** this 24th day of January, 2012.

<u>s/Keith Swisher</u>
Keith Swisher, 023493
PHOENIX SCHOOL OF LAW*
One North Central Avenue
Phoenix, Arizona 85004
Phone: 602.432.8464
Email: kswisher@phoenixlaw.edu

---

\*      Institutional designation is for identification purposes.

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)(7)(B)

I hereby certify that, pursuant to FRAP 32(a)(7)(B), the foregoing Defendant-Appellant's Opening Brief is proportionately spaced, has a typeface of 14 points, and contains 13,991 words.


s/Keith Swisher
KEITH SWISHER
*Attorney for Defendant-Appellant*

## STATEMENT REGARDING RELATED CASES

I hereby certify that I am unaware of any related cases within the meaning of Ninth Circuit Rule 28-2.6.

s/Keith Swisher
KEITH SWISHER
*Attorney for Defendant-Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that I caused the foregoing Defendant-Appellant's Opening Brief to be submitted to the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit on January 24, 2012, using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/Keith Swisher
KEITH SWISHER
*Attorney for Defendant-Appellant*